AO 106 (Rev. 01/09) Application for a Search Warrant

FILED - GR

November 19, 2009 11:08 AM

TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: FHW

# UNITED STATES DISTRICT COURT

for the

## Western District of Michigan

In the Matter of the Search of                           Case No.        1:09-MJ-111
Google, Incorporated, an e-mail provider headquartered at
One 1600 Amphitheatre Parkway, Mountain View, California, 94043.

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the Western District of Michigan (identify the person or describe property to be search and give its location):

Google, Incorporated, an e-mail provider headquartered at One 1600 Amphitheatre Parkway, Mountain View, California, 94043. Please see Attachment A

The person or property to be searched, described above, is believe to conceal (identify the person or describe the property to be seized):

Information associated with tashmoohi@gmail.com, that is stored at premises controlled by Google, Incorporated. Please see Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is (check one or more):
- ■ evidence of a crime;
- ❏ contraband, fruits of crime, or other items illegally possessed;
- ❏ property designed for use, intended for use, or used in committing a crime;
- ❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 18 U.S.C. § 1341 & 1343, and the application is based on these facts:

Please see attached Affidavit.

- ■ Continued on the attached sheet.
- ❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103(a), the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Erin B. Leipold, U.S. Postal Inspector

Sworn to before me and signed in my presence.

Date: _11/19/09_

_____
Judge's signature

HUGH W. BRENNEMAN, Jr.
United States Magistrate Judge

**City and state:** GRAND RAPIDS, MICHIGAN

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with tashmoohi@gmail.com that is stored at premises owned, maintained. controlled. or operated by Google, Incorporated, a company headquartered at One 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B
### Particular Things to be Seized

I.      Information to be disclosed by Google, Incorporated:

To the extent that the information described in Attachment A is within the possession, custody.

or control of Google, Incorporated, Google, Incorporated is required to disclose the following

information to the government for each account or identifier listed in Attachment A:

      a.      The contents of all e-mails stored in the account, including copies of e-mails sent

from the account;

      b.      All records or other information regarding the identification of the account, to

include full name, physical address. telephone numbers and other identifiers, records of session

times and durations, the date on which the account was created, the length of service. the types of

service utilized, the IP address used to register the account, log-in IP addresses associated with

session times and dates, account status, alternative e-mail addresses provided during registration,

methods of connecting, log files, and means and source of payment (including any credit or bank

account number);

      c.      All records or other information stored by an individual using the account,

including address books. contact and buddy lists, pictures, and files;

      d.      All records pertaining to communications between Google, Incorporated and any

person regarding the account, including contacts with support services and records of actions

taken.

II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and

instrumentalities of violations of Title 18, United States Code, Sections 1341 and 1343,

involving Jay Fletcher Vincent, Shani Saxon-Vincent, Anthony Portee, and/or businesses operated by Vincent and Saxon-Vincent since 1/01/02. For each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      E-mail messages relating to the operation of businesses owned and operated by Vincent and Saxon-Vincent, to include those relating to: applications for employment, applications for sports teams, correspondence to or from applicants, complaints/inquiries from applicants, advertisements placed with various media outlets, merchants providing a service to the business, the operation of business websites, employees, business accounts, payments received or made, contracts, requests for services, insurance payments and/or policies, seminars/informational meetings/clinics, legal proceedings (past, present, and future), insurance claims, and assets or liabilities.

b.      Records relating to who created, used, or communicated with the account or identifier.

## AFFIDAVIT

I. Erin B. Leipold, being duly sworn on oath, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Google, Incorporated, an e-mail provider headquartered at One 1600 Amphitheatre Parkway, Mountain View, California, 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. 2703 (a), 2703 (b)(1)(A) and 2703(c)(1)(A) to require Google, Incorporated to disclose to the government. records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a U.S. Postal Inspector with the U.S. Postal Inspection Service and have been so employed since January of 2008. Prior to that, I worked as a Regulation Agent with the Michigan Department of State Investigations Division for five years, where I investigated various fraud allegations. I am currently assigned to the Mail Fraud team at the Detroit Division of the Postal Inspection Service, and have experience enforcing federal laws with a nexus to the U.S. mail. In connection with my official responsibilities, I was assigned the investigation of JAY FLETCHER VINCENT and others working with him. Through my participation in this investigation. information provided to me by others. and my review of records provided to me, I believe there is probable cause to believe that Vincent knowingly and willfully conspired with

1

others known and unknown, to commit mail fraud by operating an employment scheme, which

defrauds applicants of money by means of false or fraudulent pretenses, representations, and/or

promises, in violation of Title 18, United States Code, Sections 1341 and 1343. I have not

included in this affidavit all of the evidence or information I have learned during the course of

this investigation, but only that information I believe is necessary to show probable cause, as

follows:

## PROBABLE CAUSE

3.      In early 2008 the U.S. Postal Inspection Service became aware of numerous consumer

complaints filed against Foreclosure Bank Inspector Company (FBIC), which is also known as

Nationwide Property Inspections (NPI). These complaints were filed with the Better Business

Bureau (BBB), the Michigan Attorney General's Office, the Federal Trade Commission (FTC),

and various online discussion forums. The majority of these complaints alleged that these

companies were making false representations in their advertising, providing false and/or

misleading information to applicants, failing to respond to inquiries from applicants, and refusing

to address complaints. Specifically, some complainants asserted that FBIC was not hiring both

contractors and subcontractors, as it claimed, and that the background check, which costs the

applicant $89, was never conducted. Many applicants requested a refund of the background

check fee, but were denied on the basis that it had already been completed. Most complainants

stated that they applied with FBIC after seeing an advertisement for employment with the

company in a newspaper.

4.      Copies of the complaints against FBIC on record with the BBB and Michigan Attorney

General's Office were obtained by contacting staff in those offices. The FTC's online database

2

was also searched for complaints lodged against FBIC. This search located 10 complaints filed in 2007, 28 complaints filed in 2008, and 14 complaints filed thus far in 2009.

5.     Research on FBIC located the website www.foreclosurebankinspector.com, which displays a picture of Vincent with a caption "Jay Vincent, 14 yr Pro-Basketball, owner/founder of Foreclosure Inspection Company". Recently information was added to the website indicating that BRIAN SIMS also owns 13% of the business. The company website claims to hire individuals to conduct walk through inspections on foreclosed properties, without a need for the applicant to receive formal training, licensure, or certification. The homepage of the FBIC website states that their company has 6000+ inspectors and is still growing, however, other areas of the website claim other numbers. One area of the site states "We have over 8500 contract and subcontract inspectors, and we plan to add an additional 10,000 Bank Foreclosure Inspectors around the country".

6.     There are also numerous references made to FBIC being "fraud and scam proof", and as justification for these claims, Vincent posts copies of complaints received from the BBB and Michigan Attorney General's Office. The site states "the State Attorney General of Michigan, along with several other states, has our company information and knows how we conduct business", and has an icon that reads "Police and State Attorney General's Office investigated and cleared- Scam Free!". There are other ways in which Vincent attempts to lend legitimacy to his business on www.foreclosurebankinspector.com. Specifically, he posts information that FBIC is "AAA rated with major banks, mortgage companies, & other financial companies". The website also notes that Vincent was honored by Michigan State University with the Dedicated Spartan Award in 2009 for his basketball and business career success, and that FBIC was ranked the 4th

3

fastest growing minority business by the MBBA in 2000.

7.     Copies of documents identified as bank contracts have been scanned and posted on the FBIC website.  The website states the money from these bank contracts is used to pay contractors working for FBIC.  The following is written on the website "Below you may review (5) sizeable bank contracts, our US Copyright trademark, and response letter to the BBB.  We have many such contracts like these and when individuals (or competitors) file unjustified complaints, we prove them wrong.  Once again, we've displayed our private business contracts below.  These are often large, 1-7 year bank contracts used, in part, to pay our valuable inspection contractors".  In my opinion, the documents that Vincent claims to be bank contracts are poorly constructed, and do not resemble anything a bank would be likely to utilize in their operations.  Specifically, I noted that the documents are not written on business letterhead, and do not display the bank's logo.  In addition, the names of the banks Vincent purports to have these contracts with have either been blacked out, or covered.  On the homepage of www.foreclosurebankinspector.com there are approximately 15 major bank logos in a box labeled "Banks, order your inspections here", with a notation underneath that states "just some of the banks we have done foreclosure inspections for or banks whom financed a home that foreclosed, and we inspected".

8.     The FBIC website has also posted scanned copies of a number of checks, which Vincent claims to be payment FBIC received from contracts to conduct foreclosure inspections.  He claims the funds from these checks are used to pay contractors hired by FBIC. Vincent has also included copies of some of these checks in the literature FBIC sends to applicants, and responses to complaints lodged by applicants.  Literature sent to applicants notes "Please review these $14,000, $20,000, and $100,000.00 cashier checks received by our company to complete

4

'foreclosure inspections'. Management" and "Our company solicits banks, mortgage companies, brokers, investors. real estate agents and individuals that purchase foreclosed properties. They need our service of performing walk-thru damage check list inspections. We pay our 'hired' contract inspectors with this money..".

9.      The FBIC website states that applicants are either hired as a contractor or a subcontractor. A contractor is provided with inspections to complete on a weekly basis by FBIC, and is guaranteed to earn $750 a week. A subcontractor. however, is required to find their own inspections and is not paid directly by FBIC. In addition. a subcontractor is required to purchase their own general liability insurance policy, and must send $35 from each inspection they conduct back to FBIC. Only the top four out of 25 applicants applying under each announcement are hired as contractors. The applicants are ranked by how well they perform overall on a variety of tests provided by FBIC, and their background check.

10.     The FBIC website states that in order to receive consideration for employment, applicants must first submit to a background check, which includes a search of national and state criminal, and driver license databases. The background check can be conducted by the applicant's "legal representative" and forwarded to FBIC, or the applicant can pay $89 to have the check completed by a company contracted by Vincent, called SCC Background Checks. If an applicant chooses to have their background check completed by SCC Background Checks. they pay $89 directly to FBIC. This transaction can be completed through the website, over the phone, or via mail. FBIC is able to receive payment by credit card. check, money order. and/or money gram.

5

11.     After receiving payment for the background check, FBIC sends applicants a "foreclosure kit" via the U.S. mail. The Inspection Service obtained a copy of this kit from a disgruntled applicant named Cynthia Castle in June of 2008. Information obtained through an interview of Castle is detailed later in this affidavit. The foreclosure kit directs applicants to complete and return several forms in the packet, including an employment application, a racial response questionnaire, a release form relating to the background check, an employability test, a final employment evaluation quiz, an availability form, and an open book inspection examination. Applicants are not given any materials to study for the exam, and are encouraged to consult with outside sources to find answers to the exam questions. In or about May of 2009, FBIC added another requirement that applicants complete a test inspection at a location provided by FBIC. Within a few days of receiving their foreclosure kit, applicants receive a call from FBIC with information on how and where to complete that inspection. The Inspection Service learned of this new requirement after completing a test purchase through FBIC, which is detailed later in this affidavit.

12.     Once applicants complete the forms, tests, and test inspection, they return them to FBIC. This is usually done through the United States mail. The applicant's submission is graded, and within a 10 day time frame, they are supposed to receive a "welcome letter", which informs them whether they were selected for a contractor or subcontractor position. If selected as a subcontractor, applicants must purchase a $300,000 general liability insurance policy prior to beginning work. Subcontractors are also instructed to read the subcontractor's orientation on the FBIC website.

13.     On June 9, 2008, Cynthia Castle was interviewed by the Postal Inspection Service

6

regarding a complaint she filed against FBIC in March of 2008. Castle advised that she saw an

advertisement for the company in a Columbus, OH, newspaper in February of 2008. The ad

stated that the company was hiring inspectors to complete bank foreclosure inspections and

paying them $750 a week. Castle called the phone number listed in the ad, and spoke with a

female who told her about the FBIC website. Castle went to the website and filled out an online

order form to obtain an application and the foreclosure kit, which cost her $89. Castle used her

credit card to make this purchase. She received her application materials and foreclosure kit via

mail shortly thereafter. Castle completed several documents, including a 60 question form, and

returned them to FBIC via Registered U.S. Mail. After returning her documents to FBIC, Castle

became suspicious of the legitimacy of the company. She contacted her credit card company and

was told that the $89 charge she authorized was from a bookstore. Castle called the Post Office

and was able to retrieve the package she sent to FBIC. Castle provided the Postal Inspection

Service with several documents associated with her order from FBIC. One of these documents

was an online Authorize.net receipt from Vincent & Sanders Properties Inc., confirming Castle's

order. Castle also provided a copy of an email she received from Vincent & Sanders Properties

Inc., confirming she ordered one employment background check and property inspector package,

for the price of $89. The email directed her to contact the company with any problems or

questions at nwpi101@aol.com. It also listed the address tashmoohi@gmail.com. Finally,

Castle provided the newspaper advertisement to which she responded.

14.     Staff members at the U.S. Postal Service office located on Collins Road in Lansing,

Michigan, were contacted to determine if Vincent was a known customer there. They advised

that Vincent and/or his employee "Anthony", have been coming in to their office two to three

7

times a week for at least the past year and a half. Vincent typically mails between 75 and 150 flats at a time, which costs him at least $4.80 apiece. Vincent has told staff he was mailing foreclosure notices. A friend of one of the employees who works at the Collins Road office was identified as one of Vincent's former employees.

15.     This friend, SAMANTHA WASHINGTON, was interviewed by postal inspectors in February of 2009, regarding her employment with FBIC. Prior to this interview postal inspectors requested a criminal history check on Washington through LEIN (Law Enforcement Information Network), which returned no results. During the interview Washington did advise postal inspectors that she had a substance abuse problem in the past. Washington told postal inspectors that she worked at FBIC for approximately four months, after being hired by Anthony Portee. At the time, the FBIC office was located at 2175 Association Drive, Suite 300, in Okemos, Michigan. Washington answered phone calls, sorted completed application packets, and prepared mailings while working there. She identified Anthony Portee and KRISTEN SMITH as Vincent's office managers. Washington and Smith worked closely together, and once Smith confided to Washington that she didn't think FBIC ever hired any contractors. Washington believed this to be true because she never received calls from contractors, or prepared any welcome letters for mailing that selected an applicant as a contractor. In addition, Portee kept a listing of subcontractors, but there was no such list for contractors. Approximately 25% of the calls Washington received were complaints from applicants. Many of the applicants were licensed inspectors or realtors, who wanted to know why they hadn't qualified as a contractor. Washington stated that every time she questioned Jay Vincent about his business practices, shortly thereafter he would call her in to his office and give her a raise. She became suspicious

8

about the legitimacy of FBIC's business practices after a while and began doing her own

investigation. Washington regularly looked through files throughout the FBIC office for

evidence that FBIC in fact maintained a general liability insurance policy for

contractors/subcontractors, and that FBIC was conducting background checks. She never found

any documents showing that the insurance policy existed. As for the background checks,

Washington asked Vincent how it could be conducted on an applicant when all the staff asked for

was their name and address. Vincent told her that the company they used could run the check

with only that much information. Vincent also wanted payments for the background checks to be

made payable to Vincent and Sanders Properties, not SCC Background Checks. Washington

attempted to call someone at SCC once, but was rerouted back to FBIC's 1-877 phone number.

While looking through Portee's desk, Washington found 100 to 200 pieces of letterhead and a

stamp with the name SCC Background Checks printed on them. Washington once witnessed

Portee loading a piece of the letterhead into the typewriter, and then stamping it when he was

done. Washington also questioned if the tests applicants completed and mailed to FBIC were

ever graded. When application packets were received in the office, staff was directed to separate

the testing materials from the other application materials. Washington stated that the testing

materials were placed in a box by the door, which was supposed to be shipped via FedEx to

TRISH BROWN, the hiring specialist in Nashville, Tennessee, for grading. In the four months

Washington worked there, this box was never emptied. She attempted to contact Brown via

phone, but once again, was rerouted back to FBIC's 1-877 phone number. Washington recalled

that Vincent congratulated employees of FBIC once, because they had brought in $40,000 that

week. She estimated that FBIC brought in $2500 from applicants in credit card charges through

9

its website, and $2500 from applicants in credit card charges over the phone on a daily basis. Vincent kept the receipts for these transactions in manila envelopes at the FBIC office. Washington advised that Vincent has two other companies, Foreclosure Home Repair and Watches 4 Wholesale, which also require background checks from applicants. Shani Saxon-Vincent also has a phone line for her cleaning company set up at the FBIC office, but it never rang. Washington stated that she was always paid in cash while working at FBIC.

16.     Another former employee of FBIC, MELISSA KELSCH, was located and interviewed by postal inspectors in March of 2009. Prior to this interview postal inspectors requested a criminal history check on Kelsch through LEIN, which returned no results. Kelsch advised she was hired by Portee in June of 2008, and worked for FBIC until late October of 2008. When she first began working for FBIC, Kelsch and Kristen Smith answered three phone lines for the company at Vincent's mother's house, located in Haslett, Michigan. In August of 2008, Vincent moved FBIC to the office on Association Drive in Okemos. While working for the company Kelsch answered phones, sorted completed application packets, and prepared mailings. She stated that Portee and Smith ran the day to day operations of FBIC. Either Vincent or Portee picked up the mail each day at the post office box used by FBIC for correspondence with applicants, and went to the post office at the end of the day to mail out foreclosure kits. At the end of the day, Smith collected the receipts relating to sales and placed them in manila envelopes. Kelsch estimated that FBIC brought in between $1500 and $4500 a day in revenue, not including transactions processed through the website, which she never dealt with. Kelsch advised that FBIC stored their records in boxes at the office. Like Washington, Kelsch also suspected that Vincent never hired any contractors. Kelsch knew that FBIC maintained a list of subcontractors, but there was

10

no such list for contractors. She received numerous calls from applicants who had been hired as subcontractors, but never received any calls from applicants who were hired as contractors. Kelsch estimated that 75% of the calls she received daily were complaints, which she referred to Portee. A number of those complaints came from applicants who were already involved in the industry, but had failed to make the cut as a contractor. Kelsch also noted that if an applicant had not received a response from their application with FBIC within ten days, they were directed to call the "status line" answered by Trish Brown. If applicants didn't receive a call back from Brown, they were to assume that they had only qualified as a subcontractor. Kelsch never spoke with anyone at SCC Background Checks. When applicants requested a copy of their background check, Portee provided a copy of it to FBIC staff and directed them to mail it out to the applicant. Kelsch also advised that she was also paid in cash while working at FBIC.

17.     As part of this investigation, I decided to conduct a test purchase through FBIC, using an undercover identity. On April 29, 2009, I made the first of nine phone calls to FBIC. The person who answered the phone, who only identified herself as "BECKY", provided me with information on FBIC's hiring process, and the differences between the contractor and subcontractor position. I elected to have the service FBIC uses, SCC Background Checks, pull my background check. I sent payment for the background check to FBIC via U.S. mail. Becky advised me to send the $89 payment to FBIC at 2843 E. Grand River Ave #305, East Lansing, Michigan 48823. She requested that the payment be made payable to Vincent and Sanders Properties. Becky also said to include my full legal name, mailing address, physical address, and phone number with the payment. She stated that the foreclosure kit would be mailed to me after payment was received for the background check. I was also informed that I would be contacted

11

by FBIC with the location where my "test inspection" was to be performed.

18.     On April 30, 2009, I sent a U.S. Postal Service money order in the amount of $89 to FBIC at 2843 E. Grand River Avenue #305 in East Lansing, Michigan 48823. I included a letter with the full legal name, mailing address, physical address, and phone number of my undercover identity with the payment. On May 6, 2009, the foreclosure kit was received via Priority Mail at an undercover post office box. I reviewed the materials in the kit and found there was an authorization form from SCC Background Checks that required my signature and information on my previous addresses. The inspection test I was sent to complete was titled "Pro-Inspect Property Inspection Examination for Sub-Contractors". Included with the kit was a business card for FBIC listing Jay Vincent as the owner and Shani Saxon-Vincent as the vice-president. Saxon-Vincent has since been identified as Vincent's wife.

19.     On May 7, 2009, I contacted FBIC by telephone, acting in an undercover capacity, to inquire about the address where the test inspection was to be conducted, and ask some questions about the application materials. I and spoke with someone who only identified herself as "ASHLEY". She advised me that FBIC hadn't called with the location of the test inspection because the office staff had fallen behind in responding to applicants. I asked Ashley about the inspection test included in the foreclosure kit, which stated it was for subcontractors because I wanted to apply to be a contractor. Ashley assured me that the right test was sent, and went on to state that FBIC only has one inspection test, which every applicant completes. I also questioned Ashley about the release form included in the kit for the background check. She stated that my background check was most likely finished by now, but FBIC needed written consent for the background check to keep on file at their office.

20.     On May 9, 2009, Benjamin Widman, a builder who is licensed with the State of
Michigan, was contacted by the Postal Inspection Service. Widman was asked to assist in the
completion of the inspection test received from FBIC. Widman was provided with a copy of the
test, so he could consult with his reference materials when answering the questions. On May 12,
2009, a fax was received from Widman, which indicated how he would answer each question on
FBIC's inspection test. The inspection test was completed using this information, with the
exception of two questions that were answered incorrectly, so as to not raise any suspicions from
staff at FBIC.

21.     On May 12, 2009, I contacted the FBIC office via telephone, once again acting in an
undercover capacity, because I still hadn't received a call regarding the location of the test
inspection. A female who only identified herself as "SARAH" told me that I should receive a
phone call by the end of the week. I insisted that the inspection needed to be completed as soon
as possible, so that I didn't miss the deadline to submit the application materials. Later that day I
spoke with Sarah again, and she advised me that the test inspection should be completed at 3180
Pittsview in Ann Arbor, Michigan. This was solely an exterior inspection of the property. Sarah
stated that FBIC didn't know if the property was inhabited or not. If it was, Sarah told me to
complete the inspection from the street. Once the test inspection was finished, I was told to mail
back all the application materials to FBIC.

22.     Investigation found that the property at 3180 Pittsview in Ann Arbor is currently in
foreclosure. The Inspection Service contacted Jeff Jimmar, a fraud investigator at U.S. Bank, the
lender foreclosing on the property. After conducting some research, Jimmar verified that the
property at 3180 Pittsview in Ann Arbor is owned by U.S. Bank. He stated that U.S. Bank has

13

never heard of FBIC or NPI.  Neither of these companies have contracts with U.S. Bank.

23.     On May 15, 2009, I returned the application materials in the name of my undercover

identity to FBIC via Priority Mail.  On June 3, 2009, I received a welcome letter via U.S. mail at

the undercover post office box, which offered me a subcontractor position with FBIC.

Specifically, the letter stated "Your background check was approved and your employee score

was good, but you were not hired as a contract employee."

24.     On June 4, 2009, I contacted FBIC, while acting in an undercover capacity, and spoke

with Sarah.  She told me that I may have had a good score, but I didn't place in the top four out of

24 applicants.  Sarah stated that my background must have checked out fine, because if it hadn't,

SCC would have contacted me directly and I would have received a denial letter from FBIC.  She

also stated that I could start out as a subcontractor, and if I did between two and four inspections

a week for six months in a row, Vincent would consider making me a contractor.  In order to

begin work as a subcontractor, I needed to obtain general liability insurance.  I told Sarah I

wanted to get this insurance through FBIC.  She directed me to send a $149 payment to FBIC at

the same address I sent payment to for the background check.  The payment was to be made out

to Vincent and Sanders Properties.

25.     On June 9, 2009, I sent a $149 U.S. Postal Service money order in the name of my

undercover identity to FBIC at 2843 E. Grand River Avenue #305, East Lansing, MI 48823.  On

June 16, 2009, I received a packet from FBIC, sent via U.S. Mail, which included a certificate of

completion and a commercial general liability insurance declaration page.  The certificate stated

that I completed "necessary requirements of becoming a Foreclosure Damage Property Inspector,

also passing criminal background and driver's license checks".  The certificate was signed by Jay

14

Vincent. The documents relating to the insurance policy I purchased did not list the name of my insurance carrier. In addition, the declaration page listed the insurance agent as B.J. Jackson, but only listed Charlotte, NC 28213, as an address. The insurance documentation appeared to be photocopied, and was in my opinion, of poor quality in general.

26. Research was conducted to locate B.J. Jackson in Charlotte, NC, but the only record that could be located in Accurint was one for a deceased individual.

27. On June 17, 2009, I contacted FBIC, acting in an undercover capacity, and spoke with Becky, who stated that she is a manager with the company. Becky stated that I was insured through Nationwide Insurance. She stated that she would leave a message for Portee indicating that I needed a new insurance certificate, since mine didn't list the insurance carrier. During this phone conversation with Becky, she disclosed that FBIC was moving their office to 2126 Aurelius in Holt, Michigan, that weekend. I asked Becky about complaints filed against FBIC, and she responded that there have only been six complaints in the past thirty-six months, which she didn't consider to be a lot given that FBIC was a nationwide company. I questioned Becky about the material on the web that claims FBIC is a scam. She stated "scams make you pay for something. We don't need you to pay for any, plus the $89 for background checks goes to SCC Security Checks, we don't get it. It's not for us." Becky also stated, "Like I said, National City, Bank of America, Fifth Third, Bank of Tennessee, Wells Fargo, Key Bank, all, there's I think like 13 or 14 that we have contracts with all over the United States."

28. The Inspection Service contacted Dean Sanderson, who is employed in Nationwide Insurance's investigative unit. Sanderson searched their records, and those of other insurance companies associated with Nationwide, for policy number 2g4-77jm-1b, which is listed on the

15

insurance declaration page FBIC provided to me when I made the undercover test purchase. Sanderson advised that there is no record of this policy number in their system. In addition, Sanderson searched for records in the undercover name I used on the application with FBIC, and was unable to locate any information on a policy in this name. Finally, Sanderson searched for records related to Jay Vincent, FBIC, and Nationwide Property Inspections. Once again, he was unable to locate any policies belonging to these entities.

29.     Staff at the Michigan Department of State Investigations Division was contacted regarding the undercover identity I used to make a test purchase from FBIC and the Michigan operators license associated with that identity. Staff advised that if this operator license number would have been queried through LEIN or the Michigan Department of State's Record Lookup Unit, there would have been an alert sent to the individual at the Department of State who manages the undercover operator license program. No such alert was sent to that person. This verifies that a background check service did not query the record related to the operator license I used in the test purchase with FBIC through the State's database.

30.     On July 20, 2009, I contacted FBIC, acting in an undercover capacity, and spoke with a man who identified himself as "Mr. Portee". He told me that my insurance policy was with Nationwide, but their insurance broker in North Carolina, B.J., shops around for insurance, so it might be a with different carrier this month. He assured me that the insurance policy I paid for was legitimate. I told Portee that I was concerned that I may be getting hustled by FBIC, and he retorted "Nope, nope, nope. We've been around for 25 years." Portee stated he would look in to getting me a corrected insurance certificate. To date, no additional calls or mailings have been received from Portee or FBIC.

31.     The Inspection Service contacted numerous financial entities to determine if they had

record of any contracts with Vincent, his business associates, and/or the variety of other names

Vincent conducts business under. These financial institutions included; Fifth Third Bank, Bank

of America, Bank of Tennessee, JP Morgan Chase, Citi Bank, Citizens, Comerica, First

Community Bank, First Premier Bank, Key Bank, National City, PNC Bank, Regions Bank,

Southern Community Bank, SunTrust Bank, U.S. Bank, Wachovia, and Wells Fargo. Vincent

has logos belonging to the majority of these entities posted on

www.foreclosurebankinspector.com, and insinuates that FBIC had contracts with them to

perform foreclosure inspections. In addition, Becky at FBIC told me during one of my

undercover phone calls that FBIC has contracts with National City, Bank of America, Fifth

Third, Bank of Tennessee, Wells Fargo, and Key Bank. Any entities that didn't have their logos

posted on the FBIC website were contacted because official checks with their logo were posted

on the website. After searching their records, none of these financial institutions returned any

documentation relating to contracts with FBIC. In fact, several calls were received from

representatives of these institutions who questioned why the Postal Inspection Service thought

that their employer had contracts with FBIC.

32.     The Postal Inspection Service also contacted Regions Bank, Citizens Bank, National City

Bank, and Southern Community Bank & Trust to investigate whether or not official checks

Vincent posted on the FBIC website from these entities were legitimate.

33.     Danielle Myrick, a representative in the Legal Processing Department at Regions Bank,

searched for records relating to official check 900606XX, purchased by Property Rental

Company on January 24, 2008, made payable to Foreclosure Bank Inspection Co. in the amount

17

of $104,000. Part of the official check number was obliterated. Myrick was unable to locate any record in their system of this check.

34.     Todd Osborn, Security Officer with Southern Community Bank & Trust, searched for records relating to official check 3X3X743, purchased by Foreclosure Co. on December 20, 2007, made payable to Foreclosure Bank Insector Co. in the amount of $14,149.00. Part of the official check number was obliterated. Osborn was unable to locate any record in their system of this check, and advised me that the official check number was out of range for anything Southern Community Bank & Trust has ever issued. Osborn stated that they have no relationship with Foreclosure Co., Foreclosure Bank Inspector Co., or Vincent. In addition, the signature on the official check does not match anything they have in their system.

35.     Carolyn Matheillis, a representative in the legal processing department at National City Bank, searched for records relating to official check 7441232, purchased by N.E.C. Corporation on October 16, 2002, made payable to Italian Red Dogs/Jay & Doris Vincent in the amount of $292,900.24. Matheillis advised that 7441232 was a partial check number, and that no checks were issued by National City Bank in the amount of $292,900.24 on October 16, 2002. Matheillis searched their system for any checks issued with the partial number 7441232. She located official check number 874412323, purchased by SANDRA HICKS and Shani Saxon on October 16, 2002, made payable to Citi Mortgage Company in the amount of $2,929.74. Investigation has found that Sandra Hicks is Vincent's mother-in-law.

36.     Kathleen Kisthardt, with the Fraud Prevention and Investigative Services unit of Citizens Bank, searched for records relating to two official checks. The first one was official check 214749, purchased by Briarwood Realty on either July 19, 2002 or July 19, 2007, and made

18

payable to Jay Vincent Properties in the amount of $702, 666.70. Kisthardt was unable to locate any record of this check in their system, and determined it does not exist. The second one was official check 215820XX, purchased by Foreclosure Investment Co. on November 17, 2007, and made payable to Jay Vincent Inspections in the amount of $20,118.00. Note that part of the official check number was obliterated. Kisthardt was unable to locate any record of this check in their system, and determined it does not exist.

37.     The Postal Inspection Service attempted to locate information on the business known as SCC Security Checks through Accurint, but was unable to find any record of this company after performing a number of different queries. This company is not registered with the State of Michigan Department of Economic Growth. Several months into this investigation, a contract was posted on www.foreclosurebankinspector.com, showing that Vincent sold SCC Security Checks in 1998 to what appears to be two married couples. Research was conducted on those individuals, but no information was found showing that they ever lived together. Investigation, including the examination of Vincent's bank records, found that in 2005, Vincent deposited a number of checks into his Wachovia bank account that were written to "SCC /Jay Vincent". The checks were endorsed by Vincent and a stamp reading "SCC Checks". No payments to SCC Security Checks from Vincent or his companies have been located through the analysis of these bank account records.


38.     Research found that Vincent has filed over thirty Certificates of Persons Conducting Business Under an Assumed Name (DBAs) at the Ingham County Clerk's Office since 1991. Of particular interest was the fact that a record of a DBA for SCC Security Checks was not located

19

in Vincent's name. Certificates for the following foreclosure, cleaning, and/or property management businesses were registered in Vincent's name; Foreclosure Home Repair Company, Jay Vincent & Sanders Properties, Jay Vincent & Sanders & James Properties, Foreclosure Inspections Co, Tax Lien Inspection Co, Housemaster, Nationwide Property Inspections, National Property Inspections, Foreclosure Bank Inspection Company, U.S. Clean, and Pro-Inspect Home Inspections. A number of certificates were also located for sports recruiting/management businesses, including; All Sports Management, Jay Vincent Basketball Camp/Company, European Basketball Scouting Service, Italian Red Dogs-Team #2, Semi-Pro Football & Basketball Co., and Bowling for Cash Company. Records for two janitorial/cleaning businesses belonging to Saxon-Vincent, Everyday Home Helpers Company and Service Master Cleaning Company, and a rental management company called Saxon, Vincent, Hicks Mgt. Co., were also found.

39.     Investigation has also found information indicating that Vincent has conducted business under the name "Charlotte Child and Family Action Center", using the address 1001 E. W.T. Harris Boulevard Suite P281 in Charlotte, North Carolina, 28213. Bank records confirm Vincent controlled a Wachovia bank account where he deposited a number of checks written to himself and/or this company. Though the checks varied in amount, a number of checks were written in the amount of $89, and denoted "background check" in the memo line. Analysis of the records related to bank accounts controlled by Jay Vincent and/or Shani Saxon-Vincent indicate that Vincent has been collecting fees for insurance related to basketball try-outs as well.

40.     Research has located five additional websites belonging to Vincent. They are; www.foreclosurehomerepair.com, www.taxlieninspections.com, www.watches4wholesale.com,

20

www.yourhomecashbusiness.com, and www.probasketballcompany.com. Like

www.foreclosurebankinspector.com, all of these websites offer employment for a fee. With the

exception of www.yourhomecashbusiness.com, they also all require that applicants submit to a

background check. Applicants can obtain this background check themselves, or pay a fee, which

varies on each website, to have a company contracted by Vincent run their background check.

Watches4wholesale.com specifically names this service as SCC Background Checks.

41.     Another website, www.everydayhomehelpers.com, belonging to Shani Saxon-Vincent,

also offered employment and requires that applicants obtain a background check. Like

www.foreclosurebankinspector.com and www.watches4wholesale.com, Saxon-Vincent's website

offers applicants the convenience of using SCC Background Checks to have their background

check completed. The website www.everydayhomehelpers.com became inoperable in recent

months.

42.     On August 25, 2009, search warrants were executed at Vincent's residence, located at

1075 Wild Ginger Trail in Haslett and the FBIC office, located at 835 Louisa St, Suites 101-108,

in Lansing. As a result of these search warrants, a large amount of records related to Vincent's

businesses were seized. In addition, several computers were seized and/or imaged by agents with

Internal Revenue Service, Criminal Investigation Division.

43.     Vincent arrived at the FBIC office during the execution of the search warrant, and agreed

to be interviewed by myself and a special agent with IRS-CID. Prior to arriving at the search site

Vincent was made aware of our presence at his office, and contacted me via telephone. Vincent

advised me that he wanted to discuss the operations of his business with law enforcement agents,

and stated he would be arriving shortly. He came to the FBIC office of his own volition, and was

21

free to leave at any time. Vincent advised that he had spoken with his lawyer, who advised him

not to come to the FBIC office, but he stated he came anyway because he didn't have anything to

hide. Vincent was allowed to speak with his lawyer during the course of our interview.

44.     Vincent made several admissions during this interview. He stated that FBIC does not

have any large contracts with banks or other entities. The contracts posted on the FBIC website

are false. Vincent also admitted that the checks posted on the FBIC website do not exist, and

they are altered. FBIC has not received checks related to contracts with banks or other entities.

He posts the contracts and checks on the internet to lead people to believe that FBIC is a

successful company. He claimed that the checks and contracts are "examples" of what applicants

could possibly achieve as foreclosure inspectors, though none of his inspectors ever have.

Vincent admitted that FBIC does not have any contractors. Every applicant is offered a job as a

subcontractor with his company. Vincent stated that SCC Security Checks is a company he

owns. He does not pay a third party company to conduct FBIC applicant's background checks.

Vincent checks out the information applicants provide to FBIC himself by making a few phone

calls to different sources or checking the internet for any negative information on the applicant.

He admitted that he may miss a few background checks on occasion, and he assumes the

information applicants provide him is correct if he can't locate any information on the applicant.

Vincent stated that Trish Brown, who he refers to as FBIC's hiring specialist on his website, has

never worked for the company. He claimed that she may do a few things here or there for him,

but she does not handle the grading of application and testing material submitted to FBIC by

applicants. Vincent stated that he, Portee, and his staff "glance at" the materials submitted to

FBIC by applicants, but the tests aren't really graded. Vincent is more concerned with the

22

answers applicants provide on the racial bias questionnaire, the employability test, and the test inspection. Vincent stated that his main concern is getting people signed up to use the program he has developed for conducting foreclosure inspections. Finally, Vincent told me that Brian Sims does not exist, and that he had his website guy put that picture on his website because he thought he might get more white applicants with FBIC.

45.     During my interview with Vincent he stated that he and Portee were returning from a business trip to North Carolina, where they were conducting seminars for potential FBIC applicants. Vincent stated that materials related to these applicants were located in his vehicle. Vincent was asked for consent to search his vehicle, to which he agreed. Postal Inspectors searched Vincent's vehicle, which bore Michigan license plate BXL2628, and located a number of documents related to FBIC. They also located two laptop computers in the back seat of the vehicle, which were identified as Toshiba laptop computer bearing serial number X7221772Q, and a HP Mini laptop computer bearing serial number CNU9022B7T. Postal inspectors asked Vincent for permission to take these computers. He agreed, but stated that he needed them back soon because he has a business to run.

46.     A forensic analysis was conducted on the contents of the laptop computers located in Vincent's vehicle during the execution of the search warrant. A document showing an email communication from Ken Vander Meeden, CEO of the BBB of Western Michigan, addressed to tashmoohi@gmail.com, was located. This email related to Nationwide Property Inspection's improper use of the BBB name, and misrepresentation of themselves as a BBB member. Typed above the email communication was a response to this e-mail from "James T.", head supervisor at FBIC. I recalled that during our interview of Vincent on August 25, 2009, Vincent advised

23

that he represents himself as "James Taylor" at times while operating FBIC. It appears that Vincent used the e-mail address tashmoohi@gmail.com to receive communications from the BBB in regards to the activities of his business, Nationwide Property Inspections, and prepared a response to that communication as "James T.".

47.    Based upon the information detailed above, there is reason to believe that the e-mail account tashmoohi@gmail.com is used by Vincent and/or his businesses to communicate with applicants and the BBB. Therefore, it is likely that there is information contained within the email account tashmoohi@gmail.com that relates to the operations of Vincent's businesses.

## TECHNICAL BACKGROUND

48.    In my training and experience, I have learned that Google, Incorporated provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public. Subscribers obtain an account by registering with Google, Incorporated. During the registration process, Google, Incorporated asks subscribers to provide basic personal information. Therefore, the computers of Google, Incorporated are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google, Incorporated subscribers) and information concerning subscribers and their use of Google, Incorporated's services, such as account access information, e-mail transaction information, and account application information.

49.    In general, an email that is sent to a Google, Incorporated subscriber is stored in the subscriber's "mail box" on Google, Incorporated servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google, Incorporated servers indefinitely.

24

50.      When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via
the Internet to Google, Incorporated's servers, and then transmitted to its end destination.
Google, Incorporated often saves a copy of the e-mail sent.  Unless the sender of the e-mail
specifically deletes the e-mail from the Google, Incorporated server, the e-mail can remain on the
system indefinitely.

51.      A Google, Incorporated subscriber can also store files, including e-mails, address books,
contact or buddy lists, pictures, and other files, on servers maintained and/or owned by Google,
Incorporated.

52.      Subscribers to Google, Incorporated might not store on their home computers copies of
the e-mails stored in their Google, Incorporated account.  This is particularly true when they
access their Google, Incorporated account through the web, or if they do not wish to maintain
particular e-mails or files in their residence.

53.      In general, e-mail providers like Google, Incorporated ask each of their subscribers to
provide certain personal identifying information when registering for an e-mail account.  This
information can include the subscriber's full name, physical address, telephone numbers and
other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of
payment (including any credit or bank account number).

54.      E-mail providers typically retain certain transactional information about the creation and
use of each account on their systems.  This information can include the date on which the
account was created, the length of service, records of log-in (i.e., session) times and durations,
the types of service utilized, the status of the account (including whether the account is inactive
or closed), the methods used to connect to the account (such as logging into the account via

25

Google, Incorporated's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

55. In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

56. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google, Incorporated to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

57. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Google, Incorporated

26

there exists evidence of a crime and contraband or fruits of a crime. Accordingly, a search warrant is requested.

58.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that + has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

59.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Further affiant sayeth not.

Erin B. Leipold
U.S. Postal Inspector

Subscribed and sworn to before me, this 19 day of November, 2009.

Honorable Hugh W. Brenneman Jr.
Magistrate Judge, United States District Court
Western District of Michigan
Grand Rapids, Michigan

27